**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CHRISTOPHER QUICK, et al.<br><br>Plaintiffs,<br><br>v.<br><br>TOWNSHIP OF BERNARDS, et al.<br><br>Defendants. | Civil Action No. 17-05595 (GC) (JBD)<br><br>**OPINION** |

**CASTNER, United States District Judge**

This matter comes before the Court on competing motions for summary judgment filed by Defendant Township of Bernards, Township of Bernards Township Committee, and Township of Bernards Planning Board (collectively, the Township) and Plaintiffs Christopher and Loretta Quick under Federal Rule of Civil Procedure (Rule) 56. Following briefing by the parties, the Court carefully considered the parties' submissions and decides the motions without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, the Quicks' complaint is **DISMISSED** for lack of subject-matter jurisdiction.

### I.      BACKGROUND

The Quicks claim that their First and Fourteenth Amendment rights were violated when the Township, in a separate lawsuit the Quicks were not parties to, entered into a settlement agreement, whose terms were then incorporated into a court order, that prohibited "commentary regarding Islam or Muslims" during a *Whispering Woods* hearing on a site plan application to build a mosque next door to their home. Days before the hearing, the Quicks sought to enjoin the Township from carrying out the Settlement Agreement. They argued that the Settlement

Agreement prohibited their planned commentary on topics that were relevant to the site plan application but referenced Islam or Muslims.  The Township insisted it did not, twice—shortly after the Quicks sued and during oral argument on their injunction motion.  The Court agreed with the Township and denied the preliminary injunction hours before the *Whispering Woods* hearing.

At the beginning of the *Whispering Woods* hearing, the Township announced that speakers could comment on relevant topics even if they referenced Islam or Muslims.  Still, the Quicks refrained from sharing their planned commentary, fearing that the Township was wrong about what the Settlement Agreement permitted and that they would face "adverse legal consequences" for their planned commentary.  (ECF No. 17 ¶ 54.)

Afterwards, the Quicks amended their complaint to change their injury theory from imminent future harm to actual past harm, the harm being chilled speech.  Chilled speech or self-censorship can be an injury when "it is objectively reasonable and fairly traceable to the challenged regulation."  *Greenberg v. Lehocky*, 81 F.4th 376, 388 (3d Cir. 2023).  The Quicks' self-censorship, however, was not objectively reasonable.  The Settlement Agreement was not enforceable against the Quicks, the Township invited their planned commentary three times, and the Court ruled that their planned commentary would not violate the Settlement Agreement.  The Quicks censored themselves anyway.  The Quicks "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013)) (alterations in *Greenberg* omitted).  "Without a credible threat of enforcement," the Quicks cannot establish "an objectively good reason for refraining from speaking and 'self-censoring' instead."  *Id.* (quoting *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018)).  The Quicks therefore lack standing to bring their claims.

### A.    Material Facts Not Genuinely In Dispute

In April 2012, the Islamic Society of Basking Ridge (ISBR) applied for the Bernards Township Planning Board's approval to build a mosque at 124 Church Street, Bernards Township. (ECF No. 17 ¶¶ 15, 21; Pls.' Resp. to Defs.' Statement of Material Facts (RDSMF) ¶¶ 4-5, ECF No. 116.)   The Planning Board held 39 public hearings where citizens provided unrestricted commentary about ISBR's application.  (ECF No. 17 ¶ 22; RDSMF ¶ 6.)  In December 2015, the Planning Board voted to deny the application, and the next month, it adopted a formal resolution memorializing the denial.  (ECF No. 17 ¶¶ 23-24; RDSMF ¶ 7; Defs.' Resp. to Pls.' Statement of Material Facts (RPSMF) ¶ 7, ECF No. 115 at 23-32.[1])

In March 2016, ISBR and its founder and then-president, Mohammad Ali Chaudry, sued the Township and others in federal court, challenging the Planning Board's denial of ISBR's application.  (ECF No. 17 ¶ 25; RDSMF ¶ 8; RPSMF ¶ 8; Affidavit of Eric L. Harrison, ECF No. 114 at 4-6, Ex. A, ISBR Compl., ECF No. 114-1 at 1-118; *see* Compl., *Islamic Soc'y of Basking Ridge v. Twp. of Bernards*, Civ. No. 16-01369 (D.N.J. Mar. 10, 2016), ECF No. 1.)

Shortly after ISBR's filing, the United States Department of Justice began investigating the Planning Board's denial of ISBR's application.   In November 2016, the DOJ sued the Township for violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5.  (RPSMF ¶ 10; Harrison Aff. Ex. B, DOJ Compl., ECF No. 114-1 at 120-32; *see United States v. Twp. of Bernards*, Civ. No. 16-08700 (D.N.J. Nov. 22, 2016), ECF No. 1.)

---

[1]    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

In May 2017, the parties in *ISBR v. Township of Bernards* entered into a settlement agreement that resolved the ISBR and DOJ actions.  (ECF No. 17 ¶ 26; RDSMF ¶ 9; RPSMF ¶ 13; Harrison Aff. Ex. C, 5/30/17 Settlement Agreement, ECF No. 114-1 at 133-193.)   The Settlement Agreement incorporated by reference the Township and DOJ's agreement as "binding obligations assumed by [the Township] as to [ISBR]," giving ISBR "the right to enforce" the terms of the DOJ agreement.  (RPSMF ¶ 14; Harrison Aff. Ex. C, Settlement Agreement ¶ 11, ECF No. 114-1 at 143.)

On May 30, 2017, the Court entered the parties' proposed form of order that (1) incorporated the terms of the Settlement Agreement, expressly making them "fully enforceable as an Order of this Court"; (2) retained the Court's jurisdiction "for all purposes for the term set forth in the Settlement Agreement"; (3) appointed a special master "for the purpose of resolving disputes between the Parties pursuant to the terms of the Parties' Settlement Agreement, as incorporated under this Order"; and (4) directed the parties to dismiss the case "[u]pon the expiration of the Court's retention of jurisdiction, as specified in the Parties' Settlement Agreement and incorporated into this Order."  (Letter, *ISBR v. Twp. of Bernards*, Civ. No. 16-01369 (D.N.J. May 30, 2017), ECF No. 114; Order, *ISBR v. Twp. of Bernards*, Civ. No. 16-01369 (D.N.J. May 30, 2017), ECF No. 115; RDSMF ¶ 10; RPSMF ¶ 15.)

The Settlement Agreement set forth a process for finalizing and voting on ISBR's site plan to construct a mosque.  (RDSMF ¶ 53.)  First, ISBR had 25 days to submit the site plan.  (ECF No. 17 ¶ 28; Harrison Aff. Ex. C, Settlement Agreement ¶ 1; RDSMF ¶ 11; RPSMF ¶ 16.)  Then, the Township had 20 days to review the proposed site plan and provide any comments about the plan within the first 10 of those 20 days.  (ECF No. 17 ¶ 29; Harrison Aff. Ex. C, Settlement Agreement ¶ 1; RDSMF ¶ 12; RPSMF ¶ 16.)  After the 20-day review period, ISBR had 10 days to submit a

final site plan.  The Planning Board then needed to hold a "special meeting" to conduct a "*Whispering Woods* hearing" for "preliminary and final site plan approval of the Settlement Site Plan."[2]  (ECF No. 17 ¶ 30; Harrison Aff. Ex. C, Settlement Agreement ¶¶ 1, 3; RDSMF ¶ 13; RPSMF ¶ 16.)

To streamline the process, the Township and ISBR agreed to waive a township rule on notice requirements for submission of the site plan before holding the Special Meeting; hold the Special Meeting within only 15 days after the plan's submission to the Planning Board; and limit the Special Meeting to one hearing, requiring the Township to deliberate and vote on the site plan at that hearing.  (ECF No. 17 ¶¶ 31-32; Harrison Aff. Ex. C, Settlement Agreement ¶ 3; RDSMF ¶¶ 14-15; RPSMF ¶ 25.)  As for the scope of the Special Meeting, the Settlement Agreement provided that "[a]ll comments at the hearing made by any *interested party*"—that is, "any person owning property within 200-feet of the" site—"shall be strictly limited to addressing the differences between the Settlement Site Plan and the site plan that was denied by the Planning Board, and no other comments shall be permitted."  (Harrison Aff. Ex. C, Settlement Agreement ¶ 3(e), (g) (emphasis added); RDSMF ¶ 55; RPSMF ¶ 18.)  The Settlement Agreement set another limitation at ¶ 3(h): "No commentary regarding Islam or Muslims will be permitted."  (Harrison Aff. Ex. C, Settlement Agreement ¶ 3(h); RDSMF ¶ 57; RPSMF ¶ 19.)

The Special Meeting was scheduled for August 8, 2017.  (ECF No. 17 ¶ 33; RDSMF ¶ 16; *see* Mot. Ex. C, Meeting Agenda, ECF No. 4-3.)  The Settlement Agreement was posted on the Township's website about 60 days beforehand.  (RPSMF ¶ 26.)

---

[2]    A *Whispering Woods* hearing is the way local land use boards approve settlement agreements that resolve disputes over land use applications.  (ECF No. 114 at 18.)  *See Friends of Peapack-Gladstone v. Borough of Peapack-Gladstone Land Use Bd.*, 971 A.2d 449, 461 (N.J. Super. Ct. App. Div. 2009) (discussing *Whispering Woods*).

The Quicks, longtime residents of Bernards Township, live next door to the proposed mosque site.  (ECF No. 17 ¶¶ 11-12; RDSMF ¶¶ 2, 65, 94; RPSMF ¶ 21.)  On July 31, 2017, days before the Special Meeting, the Quicks sued the Township in federal court, claiming that the Settlement Agreement violated their rights to free speech and procedural due process and rights under the Establishment Clause.  (ECF No. 1.)  On August 2, the Quicks sought a preliminary injunction based on the First and Fourteenth Amendments.  (ECF Nos. 3, 4.)

The Quicks' action centered on the Settlement Agreement's provision that "[n]o commentary regarding Islam or Muslims will be permitted" during the Special Meeting.  (ECF No. 4 at 9; Harrison Aff. Ex. C, Settlement Agreement ¶ 3(h); RDSMF ¶ 52.)  The Quicks argued that they "desire[d] to make comments and ask witnesses questions regarding the topics of Islam and Muslims," such as "the impact that the massive proposed Islamic mosque and its many visitors will have upon [their] home and neighborhood"—considerations that the Quicks said implicate "general zoning issues, daily traffic control patterns, road construction, ordinance enforcement, water and sewage management, neighborhood aesthetics, and parking management," all of which were addressed in the Settlement Agreement and would likely come up during the Special Meeting. (ECF No. 4 at 10; Declaration of Christopher Quick ¶¶ 10-11, ECF No. 4-1; Declaration of Loretta Quick ¶¶ 10-11, ECF No. 4-2.)  But given the Settlement Agreement's proscription, which was enforceable under the Court's May 30, 2017 Order, the Quicks feared "adverse legal consequences" for sharing their planned commentary at the Special Meeting.  (ECF No. 1 ¶ 48; ECF No. 4 at 10.)

By letter dated August 4, counsel for the Township sought to alleviate the Quicks' concerns, advising counsel for the Quicks that "the Board wishes to make clear that, with respect to the [Special Meeting] scheduled for next Tuesday, August 8, 2017, public comments or

questions by your clients may address all issues relevant to the site plan application under review, even if they involve reference to Islam or Muslims." (Harrison Aff. Ex. F, 8/4/17 Letter, ECF No. 114-1 at 277-81; RDSMF ¶ 60.) The Township's letter included a prepared statement to "be read at the beginning of the meeting to clarify that there will [be] no limitation on speech that is relevant to the site plan application." (Harrison Aff. Ex. F, 8/4/17 Letter.)[3] The Township also "reserve[d] its right to exclude from its consideration any discriminatory or inflammatory statements unrelated to the land use issues before the Board." (*Id.*)

Counsel for the Quicks rejected the Township's proposed resolution, contending that the Township lacked "authority to unilaterally amend an order of the Court by taking action that is directly contrary to the Order's express terms." (Harrison Aff. Ex. G, 8/7/17 Email, ECF No. 114-1 at 282-84; RDSMF ¶ 61.)

On August 8, hours before the Special Meeting, the Court heard oral argument on the preliminary injunction. The Quicks personally attended the hearing. (RPSMF ¶ 83.) Counsel for

---

[3]     The statement said:

> **TO BE READ AFTER READING SECTION 3(h) OF THE SETTLEMENT AGREEMENT**
>
> "With regard to this clause of the Settlement Agreement, I would like to make clear that public comments and questions during this evening's meeting can address all issues relevant to the site plan application under review, even if those comments or questions involve reference to Islam or Muslims. The Planning Board will conduct this . . . Special Meeting in a manner consistent with the laws of New Jersey and the U.S. Constitution, and will consider any objections in context when and if they are made in a manner consistent with those laws. However, the Planning Board reserves its right to exclude from its consideration any discriminatory or inflammatory statements unrelated to the land use issues before it."
>
> [(Harrison Aff. Ex. F, 8/4/17 Letter.)]

the Quicks argued that "[i]t is simply impossible to discuss the construction of the mosque without touching on" Islam or Muslims.  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 7:20-22, ECF No. 114-1 at 312-74.)  When asked what they planned to discuss, the Quicks listed the following topics that reference Islam or Muslims:

- "the sufficient parking spaces" and "whether they would be available based on the number of people who would attend," requiring "reference to . . . the frequency with which the worshippers at the site attend and the number of worshippers";

- traffic on Friday afternoons, "when Muslims have their most holy of prayer";

- "the barriers that would be erected between [the Quicks'] property and the site . . . to protect their property from the intrusions that might happen from legitimate uses of the mosque";

- "the number of uses and the nature of the uses of the property," such as "celebrations that might be required under Islam weddings and alike"; and

- "the number of believers who might be attending this mosque," which is relevant for purposes of parking and traffic congestion.

[(Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 12:20-15:4, 44:16-45:1.)]

The Township responded that all those topics were permissible under the Settlement Agreement.  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 25:14-26:4, 27:7-13.)

The Court denied the preliminary injunction.  First, it found that ¶ 3(h) of the Settlement Agreement, "when read in conjunction with" ¶ 3(e), (f), and (g), "does not preclude commentary concerning topics relevant to the site plan application under review, even if the commentary involves reference to Islam or Muslims."  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 51:5-10.)  The Court also found that "the Settlement Agreement does not preclude the Bernards Township Planning Board from excluding from its consideration any discriminatory or inflammatory statements unrelated to relevant land use issues."  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 51:15-19; RDSMF ¶ 17.)  Indeed, the Quicks conceded several times that the Township could impose a

"rule of germaneness" limiting commentary unrelated to the Special Meeting's purpose.  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 6:10-18, 10:8-12, 13:14-18, 16:10-12, 43:22-44:10.)   The problem here, in the Quicks' view, was that they were "under the threat of violating a Court order." (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 13:16-17, 45:2-17.)

On the evening of August 8, the Planning Board held the Special Meeting.  At the beginning of the meeting, Jonathan Drill, the Planning Board's attorney, read into the record key parts of the Settlement Agreement.  (*See* Harrison Aff. Ex. N, 8/8/17 Hearing Tr, ECF No. 114-1 at 435-84.) After reading ¶ 3(h)'s prohibition on "commentary regarding Islam and Muslims," Drill read the prepared statement that the Township sent the Quicks on August 4.  (Harrison Aff. Ex. N, 8/8/17 Hearing Tr. 23:23-24:5; RDSMF ¶¶ 59, 88; RPSMF ¶ 27; *see* note 3 above.)

Still, the Quicks refrained from sharing their planned commentary, fearing that "they would suffer adverse legal consequences like being arrested or being held in contempt of a federal court order."  (ECF No. 17 ¶ 54; RDSMF ¶ 31; Harrison Aff. Ex. K, L. Quick Dep. 13:18-14:8, ECF No. 114-1 at 377-409; Harrison Aff. Ex. L, C. Quick Dep. 11:4-12:6, ECF No. 114-1 at 410-531.) When it was Loretta Quick's time to speak, she announced that she would "not speak and provide [her] views," "fearful of what may happen to [her] if [she] d[id] so," given that "a federal court order . . . precludes [her] and every other speaker here from discussing Islam and Muslims"; that although the Township told the Court that the Township "would not enforce this written provision," the Township "did not remove [the provision] and the judge did not invalidate it"; that the federal court order arose from a settlement agreement between the Township and ISBR; that ISBR had "harassed and intimidated" her by subpoenaing her for "private information," including "personal emails"; that the Township and ISBR were "working together," given that "in a recent court filing the town made the same attacks on [her] attorneys as ISBR did in its own prior court

papers"; and that she feared that the Township or ISBR would "retaliate against [her] and use the federal court order to place [her] in legal jeopardy if [she] g[a]ve the information" she wished. (RDSMF ¶ 63; Harrison Aff. Ex. J, Pl.'s Statement, ECF No. 114-1 at 376.)  Christopher Quick did not speak at all.  (RDSMF ¶¶ 64, 102.)

At the conclusion of the meeting, the Planning Board approved the final site plan. (Harrison Aff. Ex. N, 8/8/17 Hearing Tr. 100:3-101:1.)

On August 22, the Quicks amended their complaint to change their injury theory from imminent future harm to actual past harm, the harm being chilled speech.  (*Compare* ECF No. 17, *with* ECF No. 1.)[4]  The Quicks claim that the Settlement Agreement's prohibition on "commentary regarding Islam or Muslims" (1) restricted content- and viewpoint-based speech in violation of the First Amendment to the United States Constitution, (2) was a prior restraint on speech in violation of the First Amendment, (3) violated procedural due process rights under the Fourth Amendment to the United States Constitution, (4) violated the Establishment Clause of the First Amendment, and (5) violated the Petition Clause of the First Amendment.  (ECF No. 17.)

---

[4]       More precisely, the Quicks' new pleading was a supplementation, which "adds or alters allegations, claims, or prayers for relief in the complaint based on events that occurred *after* the initiation of the lawsuit," as opposed to an amendment, which "revises the allegations, claims, and prayers for relief in a complaint to reflect the state of things *as of* the date the action was commenced."  *Lutter v. JNESO*, 86 F.4th 111, 124-25 (3d Cir. 2023).  Indeed, the United States Court of Appeals for the Third Circuit, in denying the Quicks' interlocutory appeal, held that the Quicks' injunction application was moot because "the August 8 hearing that the Quicks sought to enjoin ha[d] already occurred" and "the settlement agreement expressly provided that there would be only one hearing on the proposed site plan."  (ECF No. 33 at 5-6.)  Since the Quicks no longer faced "a real and immediate threat of repeated injury," forward-looking relief was no longer available to them.  *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

## II.    <u>LEGAL STANDARD</u>

"Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure." *In re Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011).  Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. by & through Hall v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*  When resolving cross-motions for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party for each motion.  Fed. R. Civ. P. 56(a); *Lawrence v. City of Philadelphia, Pa.*, 527 F.3d 299, 310 (3d Cir. 2008).

## III.    <u>DISCUSSION</u>

Article III of the United States Constitution limits a federal court's jurisdiction to actual cases or controversies.  U.S. Const., art. III, § 2, cl. 1.  The case-or-controversy limit carries two requirements.  First, plaintiffs must have standing to sue.  *Greenberg*, 81 F.4th at 384 (quoting *Clapper*, 568 U.S. at 408).  "To establish standing, a plaintiff must show an injury in fact fairly traceable to the challenged action that a favorable ruling may redress."  *Id.* (citing *Clapper*, 568 U.S. at 409).  "An injury in fact must be 'concrete and particularized,' not 'conjectural or hypothetical.'"  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  Second, a case must be ripe.  *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 219 (3d Cir.

2023).  It must not depend "on contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020)).

Article III standing is a "jurisdictional issue" that "can be raised at any time, by either a party or by the court."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 280 (3d Cir. 2014) (citation and internal quotation marks omitted).  Federal courts have a "continuing obligation" to assure themselves that they have jurisdiction and thus may raise standing issues *sua sponte.  Seneca Res. Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017).  Standing "can never be waived, even when parties fail to raise [it]."  *Potter v. Cozen & O'Connor*, 46 F.4th 148, 156 (3d Cir. 2022).

"A plaintiff must demonstrate standing 'with the manner and degree of evidence required at the successive stages of the litigation.'"  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (quoting *Lujan*, 504 U.S. at 561).  "At summary judgment, a plaintiff 'can no longer rest on . . . mere allegations, but must set forth by affidavit or other evidence specific facts' establishing standing."  *Greenberg*, 81 F.4th at 384 (quoting *Clapper*, 568 U.S. at 412).

The Quicks' claims all stem from the allegation that ¶ 3(h) of the Settlement Agreement chilled their planned speech during the Special Meeting.  (*See* ECF No. 117-1 at 14-26 (arguing that ¶ 3(h) is unconstitutional viewpoint and content-based discrimination), 28 (arguing that ¶ 3(h) is "a prior restraint on speech"), 33 (arguing that ¶ 3(h) prevented the Quicks from petitioning their government), 33-35 (arguing that "the fear of possible sanction" for violating ¶ 3(h) deprived the Quicks of their procedural due process rights), 35-36 (arguing that ¶ 3(h)'s prohibition on

"commentary regarding Islam and Muslims" and not on other religions violated the Establishment Clause).)[5]

"Chilled speech or self-censorship is 'a harm that can be realized even without an actual prosecution.'" *Greenberg*, 81 F.4th at 388 (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)).  But plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending."  *Id.* (quoting *Clapper*, 568 U.S. at 416) (alterations in *Greenberg* omitted).  Nor can they "establish an injury merely through allegations of a 'subjective chill.'"  *Id.* (quoting *Clapper*, 568 U.S. at 418). "Rather, a plaintiff's self-censorship confers standing only where it is objectively reasonable and fairly traceable to the challenged regulation."  *Id.* (citing *Clapper*, 568 U.S. at 418; *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428-29 (11th Cir. 1998)); *see Koons v. Platkin*, 673 F. Supp. 3d 515, 561 (D.N.J. 2023) ("Without an enforcement proceeding, a plaintiff must show 'some likelihood that he has been or will be deterred from engaging in constitutionally protected activity by the operation of the regulations.'" (quoting *Aiello v. City of Wilmington, Del.*, 623 F.2d 845, 857 (3d Cir. 1980))).

"[T]he 'chilling effect' associated with a potentially unconstitutional law being 'on the books' is insufficient to 'justify federal intervention' in a pre-enforcement suit."  *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021) (quoting *Younger v. Harris*, 401 U.S. 37, 42, 50-51 (1971)).  Courts require "proof of a more concrete injury and compliance with traditional rules of equitable practice[,] . . . whether the challenged law in question is said to chill the free exercise of

---

[5]    Although "standing arises on a claim-by-claim basis," the Court "need not engage in a 'claim-by-claim' discussion of standing" when a plaintiff "alleges the same injury for purposes of" all claims. *Finkelman v. Nat'l Football League*, 810 F.3d 187, 203 (3d Cir. 2016) (quoting *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 139 n.5 (3d Cir. 2009)).

religion, the freedom of speech, the right to bear arms, or any other right." *Id.* (citing *Muskrat v. United States*, 219 U.S. 346, 361 (1911); *Ex parte Young*, 209 U.S. 123, 159-60 (1908)); *see Koons*, 673 F. Supp. 3d at 560 ("The impermissible chill doctrine . . . does not obviate a plaintiff's obligation to show Article III standing." (citing *Laird v. Tatum*, 408 U.S. 1, 12-13 (1972))).

The Quicks' reasons for self-censoring fit into two main theories: *first*, because the Settlement Agreement was incorporated into a court order, the Quicks could face "adverse legal consequences" for violating it; and *second*, the Quicks had reason to believe that ISBR or the Township would enforce the Settlement Agreement against them. (ECF No. 117-1 at 27, 31-32; ECF No. 118 at 14-15.) The question, as the Quicks put it, is "whether the [Quicks'] fear that they could have possibly been subject to some sanction was a reasonable fear sufficient to chill their First Amendment rights." (ECF No. 118 at 14 (citing *Greenberg*, 81 F.4th at 385, 388).)[6] The Court concludes it was not.

First, the Quicks' fear of "adverse legal consequences" for violating the Settlement Agreement was not objectively reasonable. Their fear relies on a false premise that when settlement agreements are incorporated into court orders, they become enforceable against nonparties.

A federal court does not have "inherent power" to enforce a settlement agreement, even when the court presided over the original dispute. *Brass Smith, LLC v. RPI Indus., Inc.*, 827 F. Supp. 2d 377, 380 (D.N.J. 2011) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375,

---

[6]    The Quicks base their procedural due process claim on the same alleged chill of First Amendment rights. (*See* ECF No. 117-1 at 33-34 (arguing that the Special Meeting "did not give the public 'notice and a full opportunity to be heard' regarding changes to the ISBR's site plans" but rather "prevented any mention of Islam or Muslims when discussing the construction plans for a mosque"), 35 ("Their right to speak was denied due to the fear of possible sanction if their comments were deemed to violate Paragraph 3(h).").)

380-81 (1994); *Washington Hosp. v. White*, 889 F.2d 1294, 1298-99 (3d Cir. 1989)).  Indeed, "[a] settlement agreement is a contract, and a dispute over the settlement agreement is governed by state contract law."  *Id.* (citing *Mortellite v. Novartis Crop Prot., Inc.*, 460 F.3d 483, 492 (3d Cir. 2006); *Nelson v. Pennsylvania*, 125 F. App'x 380, 382 (3d Cir. 2005)).  Thus, disputes over the settlement agreement can remain in federal court only if an independent basis for federal jurisdiction exists.  *Id.*  Otherwise, enforcement of the settlement agreement is a contract dispute for the state courts.  *Kokkonen*, 511 U.S. at 381-82.

To retain jurisdiction to enforce a settlement agreement, a federal court can invoke "ancillary jurisdiction."  Ancillary jurisdiction gives federal courts jurisdiction "over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Brass Smith*, 827 F. Supp. 2d at 380-81 (quoting *Kokkonen*, 511 U.S. at 378).  "[A] district court will have ancillary jurisdiction over a settlement agreement, permitting the court to enforce the agreement, when 'the terms of the settlement agreement had been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order.'" *Raab v. City of Ocean City, New Jersey*, 833 F.3d 286, 294 (3d Cir. 2016) (quoting *Kokkonen*, 511 U.S. at 381).  In consequence of incorporating the terms of a settlement agreement into a court order, "a breach of the agreement would be a violation of the order."  *Kokkonen*, 511 U.S. at 381.

But a settlement agreement is not enforceable against nonparties just because its terms are incorporated into a court order.  Again, settlement agreements are contracts; disputes over them are governed by state contract law.  *Brass Smith*, 827 F. Supp. 2d at 380; *see Halderman by Halderman v. Pennhurst State Sch. & Hosp.*, 901 F.2d 311, 318 (3d Cir. 1990) (noting that a court-approved settlement agreement that retained federal jurisdiction should be treated as a contract).

And in a typical case like this one, "parties who choose to resolve litigation through settlement . . . may not impose duties or obligations on a third party, without that party's agreement." *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 529 (1986); *see Webster v. Dollar Gen., Inc.*, 197 F. Supp. 3d 692, 695 n.4 (D.N.J. 2016) ("It is well-settled that a contract, alleged or otherwise, 'cannot bind a nonparty[.]'" (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002))).

Sometimes "'traditional principles' of state law allow a contract to be enforced by or against nonparties through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel.'" *White v. Sunoco, Inc.*, 870 F.3d 257, 262 (3d Cir. 2017) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)).  But here, the parties do not argue, nor does the record suggest, that any of these principles apply.  In fact, as the Quicks previously argued, "there was no participation by the Plaintiffs in the process that resulted in this order."  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 11:19-21.)

Even if, affording the Quicks all favorable inferences, the Court inferred from the record that the Settlement Agreement's contemplation of "interested part[ies]," which included the Quicks, gave the Quicks concern that they were bound to the agreement,[7] that concern would still not be reasonable.  Courts in this Circuit consistently refuse to enforce privately negotiated settlement agreements against nonparties, even when the agreements contemplate actions by those parties.  *See, e.g.*, *Metex Mfg. Corp. v. Manson*, Civ. No. 05-2948, 2009 WL 10729008, at *2 (D.N.J. July 9, 2009) (refusing to enforce a settlement agreement against a party's spouse who was not a party to the agreement but whose participation was promised under it); *Axtria, Inc. v. OKS*

---

[7]     In claiming that the Settlement Agreement applied to them, the Quicks argue that they "were interested parties" and "had a right to speak at the hearing" under ¶ 3(e) and (g).  (ECF No. 118 at 12.)

*Grp., LLC*, 702 F. Supp. 3d 299, 307 (E.D. Pa. 2023) (finding "no basis to impose contract liability upon" a nonparty who "did not sign the Agreement," "made no representations in the Agreement," "did not agree to engage in conduct or refrain from conduct," was not included in the agreed definition of "'Parties' to their obligations," and was not subject to "language extending these obligations to non-signatories").[8]

The Quicks are correct that courts can sanction nonparties in certain circumstances. But the authorities cited by the Quicks do not support their expansive application of the courts' power. For instance, the Quicks, contending that the order in this case "functioned much like an injunction," say 18 U.S.C. § 401(3) empowers a federal court to "punish acts in 'contempt of its authority' including 'disobedience or resistance to its lawful write, process, order, rule, decree or command'"—even those acts of nonparties. (ECF No. 118 at 12-13 (quoting *United States v. Morton*, 993 F.3d 198, 207 (3d Cir. 2021)).) Even if their contention were correct, the Quicks could still not show that they reasonably feared a contempt holding. To be held in contempt, the nonparty must have "actual knowledge of a court's order and either abet[] the defendant or [be] legally identified with [the defendant]." *Roe v. Operation Rescue*, 919 F.2d 857, 871 (3d Cir. 1990) (quoting *Quinter v. Volkswagen of Am.*, 676 F.2d 969, 972 (3d Cir. 1982)). Indeed, a court

---

[8]    Courts across the country agree. *See, e.g.*, *Jones v. Lujan*, 936 F.2d 583 (10th Cir. 1991) (rejecting that a settlement agreement could stop an inspector general's investigation, "because the IG was not a party to the agreement and because the court had no jurisdiction over the IG"); *Boyles v. Visteon Corp.*, Civ. No. 05-0513, 2007 WL 1723491, at *2 (N.D. Okla. June 13, 2007) (refusing to enforce a settlement agreement against a nonparty whose participation was promised under it); *In re Porrello*, 386 B.R. 206, 210 (Bankr. N.D. Ohio 2008) (refusing to enforce a settlement agreement against a debtor's spouse who neither "was represented by counsel" nor "participated in settlement discussions" or "gave her assent to the proposed" agreement, but whose conduct was promised under it); *Ass'n for Retarded Citizens of Connecticut, Inc. v. Thorne*, 30 F.3d 367, 370 (2d Cir. 1994) (holding that the district court abused its discretion when it enforced a court-approved but privately negotiated consent decree against a nonparty).

"cannot lawfully enjoin the world at large."  *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832, 832 (2d Cir. 1930).[9]

The conditions for holding a nonparty in contempt are neither present nor asserted here. Though the Quicks knew of the Court's order, nothing in the record supports the abetting and legal-identity elements.  The Quicks do not claim to be "legally identified" with the Township. They were not involved in the litigation between ISBR and the Township.  (*See* Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 11:19-21 ("[T]here was no participation by the Plaintiffs in the process that resulted in this order.").)  Nor did they risk "abetting" the Township's violation by sharing their planned commentary.  In fact, hours before the Special Meeting, the Court—whose order incorporated the terms of the Settlement Agreement—ruled that ¶ 3(h) did not prohibit the Quicks' planned commentary.  The Quicks therefore had no reasonable basis to believe that they could be held in contempt of court for not following the Settlement Agreement.

---

[9]     Courts in other jurisdictions agree.  *See, e.g.*, *Havens v. James*, 76 F.4th 103, 111 (2d Cir. 2023) ("The nonparty must either be 'legally identified' with the enjoined party or 'abet' the enjoined party's violation of the injunction." (quoting *Alemite Mfg. Corp.*, 42 F.2d at 833)); *United States of Am. v. Robinson*, 83 F.4th 868, 881 (11th Cir. 2023) (holding that an injunction can bind "a nonparty who aids or abets a nonparty in privity with an enjoined party"); *Receiver for Rex Venture Grp., LLC v. Banca Comerciala Victoriabank SA*, 843 F. App'x 485, 492 (4th Cir. 2021) ("A nonparty aider-and-abettor must be made party to the suit through proper service of process in order to be held in contempt for violating an injunction."); *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 948 (9th Cir. 2014) (applying the abetting theory of nonparty contempt); *Chicago Truck Drivers v. Bhd. Lab. Leasing*, 207 F.3d 500, 507 (8th Cir. 2000) ("[A] person, 'not a party to the suit, [may be] guilty of contempt for violation of an order of that court, made in such suit, and imposing a fine for such contempt.'" (quoting *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 325 (1904))); *see also* 11A Charles A. Wright et al., Federal Practice and Procedure § 2956 (3d ed. 2024 Update) ("[P]ersons who are not actual parties to the action or in privity with any parties may not be brought within the effect of a decree merely by naming them in the order," unless the nonparties "have actual notice of an injunction and are guilty of aiding or abetting or acting in concert with a named defendant or the defendant's privy in violating the injunction").

The Quicks cite Rule 37(b) as another example of when a nonparty can be sanctioned for violating a court order.  (ECF No. 118 at 13.)  Rule 37(b)(1) does permit courts to hold nonparties in contempt for disobeying deposition-related orders.  *Gen. Ins. Co. of Am. v. E. Consol. Utilities, Inc.*, 126 F.3d 215, 220 n.3 (3d Cir. 1997) ("The only sanction available under Rule 37(b)(1) is to hold a deponent in contempt of court.").  But before that contempt power triggers, the nonparty must be issued a court order and disobey it.  *See* Fed. R. Civ. P. 37(b)(1) ("If the court . . . orders a deponent to be sworn or to answer a question and the deponent fails to obey, the failure may be treated as contempt of court."); *see also Cates v. LTV Aerospace Corp.*, 480 F.2d 620, 624 (5th Cir. 1973) ("[N]o sanction could be imposed absent a failure and refusal to comply with the court order." (citing Fed. R. Civ. P. 37; 8 Charles A. Wright et al., Federal Practice and Procedure Civil § 2289 (1970))); 11A Charles A. Wright et al., Federal Practice and Procedure § 2289 (3d ed. 2024 Update) ("Sanctions may be imposed in appropriate cases under subdivisions (c) and (d) of Rule 37 without a court order but not under subdivision (b)."); *compare Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1224 (9th Cir. 2018) ("The court 'may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.'" (quoting Fed. R. Civ. P. 45(g))).  So absent a court order directed to them, the Quicks could not be held in contempt under Rule 37.

These authorities underscore that the Quicks faced no credible risk that the Settlement Agreement could be enforced against them.  Neither of their cited authorities applies in a situation like this one, where the Quicks were not issued a court order and did not help another party violate one.  The Quicks cite no precedent for enforcing the Settlement Agreement against them.  They were not parties to the settled lawsuit or the Settlement Agreement, nor were they in privity with a party that was.  They were neither beneficiaries of the agreement nor involved in negotiating it.

19

And they never agreed to act according to the agreement.  Absent any of those circumstances, the Court sees no reason that the Quicks could be legally bound to the Settlement Agreement.

The Quicks previously conceded that if ¶ 3(h) could not be enforced against them, they would not fear prosecution.  At oral argument on the preliminary injunction, counsel for the Quicks stated that the removal of ¶ 3(h) would remedy their fear of prosecution, because then, even if the Township imposed a rule of germaneness for the Special Meeting, at least the Quicks would not be at risk of violating a court order.[10]  But as discussed above, the Settlement Agreement could not be enforced against them; so the Quicks cannot show that they faced a credible threat of enforcement.  *See Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union free Sch. Dist.*, 478 F.3d 494, 500-01 (2d Cir. 2007) (rejecting the plaintiffs' standing to challenge a policy that was "not legally binding on the plaintiffs, and [could not] be enforced against them").

The Quicks also fail on their second theory of harm—that ISBR and the Township would enforce the Settlement Agreement against them.  An enforcement threat can be signaled by past enforcement or the enforcer itself.  *Nat'l Shooting Sports Found.*, 80 F.4th at 220 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-61 (2014)).  To defend their "fear of possible legal ramifications," the Quicks point to (1) ISBR and Chaundry's "heavy handed tactics," and (2) the Settlement Agreement's requirement that the Township enforce its terms, including ¶ 3(h).  (ECF

---

[10]     (*See* Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 20:6-11 (asking that the "provision be stricken" and that "it no longer be an order of the court"), 16:10-13 (contesting not that "if the Court order is lifted," the Township could "allow a rule of germaneness"; rather, "it's just the fear that great harm would come"), 45:2-13 (arguing that "if [the Quicks] were simply challenging a rule of the Board," the Township's statement that the Quicks' planned commentary is permissible "would perhaps be sufficient," but the Quicks "are challenging . . . that there is a Court order" and that others "have the power to enforce it"), 46:13-16 ("[I]f the Court strikes this provision, . . . it is no longer in effect and . . . their comments are not subject to a prior restraint."), 45:20-46:3 (conceding that "once that [¶ 3(h)] is stricken," the Township can judge "what is relevant and what is not").)

No. 117-1 at 31-32.)  The Court addresses ISBR and the Township as enforcers of the Settlement Agreement in turn.

The Quicks argue that ISBR signaled its intention of enforcement by previously threatening litigation and issuing subpoenas to individuals who opposed the mosque's construction.  (ECF No. 118 at 14-15.)  As an initial matter, ISBR is a private entity and not a state actor.[11]  (*See* ECF No. 119.)  Its relationship with the Township is adversarial; the Settlement Agreement resulted from litigation between ISBR and the Township.  And the Quicks do not try to attribute ISBR's conduct to the Township.

The record also shows that ISBR never sought to enforce the Settlement Agreement against anyone other than its contractual counterpart, the Township.  Indeed, ISBR's past threats of litigation and issuance of subpoenas were unrelated to the Settlement Agreement.  One threat of litigation came during a prior board meeting, after Christopher Quick said that he "wanted the illegal sewer line removed from [his] property" (Harrison Aff. Ex. L, C. Quick Dep. 18:15-24); another threat was directed not at the Quicks but at someone the Quicks hired to testify at a meeting (Harrison Aff. Ex. K, L. Quick Dep. 18:20-19:16); and ISBR subpoenaed the Quicks in connection with its lawsuit against the Township before the Settlement Agreement existed (Harrison Aff. Ex. K, L. Quick Dep. 19:22-20:25; Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 16:14-16).

The Quicks illustrated the speculative nature of their fear during oral argument on the preliminary injunction, when counsel for the Quicks argued that "it is not out of the question that" if the Quicks share their planned commentary, "ISBR might . . . move to have them held in contempt for violating [¶ 3(h)], which is one of the reasons why they're frightened and perhaps

---

[11]    Although "a private entity can qualify as a state actor in a few limited circumstances," *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019), the Quicks do not argue that ISBR qualified as a state actor.

others are dissuaded, as well, from speaking." (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 16:16-21.)

The fear of what ISBR *might* do was too hypothetical to create a credible threat of civil

enforcement. *See Port Washington Teachers' Ass'n*, 478 F.3d at 500 ("Because the plaintiffs have

not established that civil liability or professional discipline is actual or imminent, the theoretical

possibility that either *might* occur in the future does not amount to injury in fact." (citing *Lujan*,

504 U.S. at 564)).  In the same light, the Quicks' fear of ISBR's propensity to sue resembles "the

specter of [a] potential lawsuit" that courts have rejected as a "generalized allegation insufficient

to satisfy Article III's requirements."  *Nat'l Shooting Sports Found.*, 80 F.4th at 220 (quoting

*Sherwin-Williams Co. v. Cnty. of Delaware*, 968 F.3d 264, 270 (3d Cir. 2020)) (alteration in *Nat'l*

*Shooting Sports Found.*).

Next, the Court addresses the Quicks' fear of the Township as the enforcer.  The Quicks

do not claim that the Township subpoenaed them.  (Harrison Aff. Ex. K, L. Quick Dep. 21:1-3.)

In fact, at her deposition, Loretta Quick made clear that the Township never threatened or

intimidated her:

> MR. KETTERER (COUNSEL FOR THE TOWNSHIP).   Okay.
> But no one threatened you or intimidated you; is that correct?
>
> MRS. QUICK.  No. . . .  That's correct, no one threatened me.
>
> . . .
>
> MR. THOMPSON (COUNSEL FOR THE QUICKS).  When you
> say nobody's threatened you, what does that mean?
>
> MRS. QUICK.  Threatened me, no one from the planning board
> contacted me, threatened me, said that I couldn't speak, threatened
> any litigation against me, made contact with me.  I guess that's it,
> but it did not exclude my fears of Mr. Chaudry and the ISBR.  Did I
> answer that question?
>
> . . .

MR. KETTERER.  Okay.  And just to be clear, based on the last set of questions from Mr. Thompson, no one from Bernards Township, that would include elected or appointed officials, has ever threatened you or threatened litigation against you in any way for anything that has to do with the ISBR site plan; is that correct?

MRS. QUICK.  That's correct.

MR. KETTERER.  No one's subjected you to any litigation for speaking your mind at any of the other hearings; is that correct?

MRS. QUICK.  Correct.

[(Harrison Aff. Ex. K, L. Quick Dep. 57:17-59:6.)]

So did Christopher Quick during his deposition:

MR. KETTERER (COUNSEL FOR THE TOWNSHIP).  Okay.  So to be clear, the township has never retaliated against you or threatened you in any way as regards to this litigation?

MR. QUICK.  I would say no.

[(Harrison Aff. Ex. L, C. Quick Dep. 20:13-16.)]

Rather, the Quicks say because the Settlement Agreement required the Township to enforce its terms, they reasonably believed that the Township would retaliate against them if they violated ¶ 3(h).[12]  (ECF No. 117-1 at 31-32.)[13]  The Court disagrees.

"[F]undamental to a pre-enforcement challenge" is "some desired conduct by the plaintiff that might trigger an enforcement action in the first place."  *Matthew A. Goldstein, PLLC v. United States Dep't of State*, 851 F.3d 1, 4 (D.C. Cir. 2017).  The challenge for the Quicks is that before the Special Meeting, they were assured several times that they could share their planned commentary without any repercussions.  The Township invited the Quicks to share their planned commentary three times—before the preliminary injunction hearing, during that hearing, and at the beginning of the Special Meeting.  Even if the Township's assurances could not ease the Quicks' fear, the Court's ruling that "[¶ 3(h)] does not preclude commentary on the topics identified by [the Quicks]" should have.  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 51:11-14.)

---

[12]    The Quicks strongly imply that a fear of being told to stop speaking during the Special Meeting is not an injury.  They argue that "[u]nlike other Planning Board hearings, where a resident could simply be told to stop talking, here if a speaker made a comment regarding Islam or Muslims that a member of the Board deemed not relevant to the site plan, the speaker could be held in contempt of Court for violating a provision of a Court order."  (ECF No. 117-1 at 27.)  And they argue that instead of "banning all commentary regarding Islam and Muslims," the Township "could have maintained orderly meetings by waiting to hear what people had to say and then admonishing people who made comments deemed inappropriate for the forum."  (ECF No. 118 at 9.)  For completeness, the Court addresses standing as though the Quicks believed that the fear of being told to stop talking chilled their speech.  *C.f. Marshall v. Amuso*, 571 F. Supp. 3d 412, 418 (E.D. Pa. 2021) (ruling that "four Pennsbury School Board meeting attendees whose public comments [were] interrupted or terminated by Board members or designees based on Policy 903" had meritorious First Amendment claims).

[13]    Counsel for the Quicks made the same argument for the preliminary injunction.  (*See* Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 7:6-13 ("[T]he [Township], who would be responsible for enforcing that Court order are themselves defendants in the ISBR suit and therefore have a vested interest in ensuring that they themselves do not run afoul of that order; and if they themselves do not do anything that causes ISBR to find -- to assert that they are in breach of that Settlement Agreement.").)

All the planned commentary in the record echoes what the Court considered in its preliminary injunction ruling.  At her deposition, Loretta Quick testified that she wanted to ask the following questions: How would "worship five times a day" impact the Quicks' property?  Would Muslims worship outside and facing the Quicks' property east of the site?  Where would overflow parking be during Ramadan?  Would she "hear prayer all night long if there were prayer meetings that lasted for 10 days through the night at Ramadan?"  "Would there be communal meals, weddings, feasts that are associated to any religion that were going to be almost like a constant chronic party going on on the weekends next door" to the Quicks' property?  And how would the Muslim practice of ablution and the use of cleansing fountains five times a day effect the sewer lines running through her property?  (RPSMF ¶ 30; Harrison Aff. Ex. K, L. Quick Dep. 39:24-42:18.)

Likewise, Christopher Quick testified that he wanted to comment on the following topics: "the reasons that the planning board had originally denied the application for the ISBR";[14] his concern that Muslims worshiping at the mosque "could meet five times a day on a county road that's already packed by a nearby school where the traffic backs up, a dangerous intersection right on top of the property"; the frequency of services at the mosque; the "insufficient parking for the size of the building that they were planning"; the impact of funerals "to take place on the property and not in a funeral home or mortuary"; and the times he saw "men in white robes" late at night "walking in the backyard with lights" before they began construction.  (RPSMF ¶¶ 86-87; Harrison Aff. Ex. L, C. Quick Dep. 11:17-12:13, 22:11-24:25.)

---

[14]    The Quicks allege that the Planning Board denied the initial mosque application "based purely on the zoning rules and the site plans presented."  (Pls.' Statement of Material Facts (PSMF) ¶ 62, ECF No. 117-3.)  Though the Township disputes this allegation, the Court accepts the Quicks' version for purposes of the Township's motion for summary judgment.

Before the Special Meeting, the Court ruled that essentially similar speech proposed by the Quicks concerned "relevant land use issues, such as traffic and parking," that did not offend the Settlement Agreement.  (Harrison Aff. Ex. I, 8/8/17 OTSC Tr. 51:1-3.)  The Township's and the Court's assurances that the Quicks could share their planned commentary foreclose the Quicks' claim of an injury in fact.  *See Greenberg*, 81 F.4th at 388-89 ("Greenberg fails to establish an injury in fact because he has an assurance he will not face discipline under Rule 8.4(g)."); *Nat'l Shooting Sports Found.*, 80 F.4th at 221 (finding relevant that "the Attorney General has disavowed prosecuting the [plaintiff] or its members just for participating in 'lawful commerce,' which is all the [plaintiff] has said it wants to do"); *Matthew A. Goldstein*, 851 F.3d at 5 ("[Plaintiff] offers only vague and general descriptions of legal activities that the firm intends to undertake, none of which the [government] views as" unlawful); *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1007 (9th Cir. 2011) ("[Plaintiff] did not make any allegations regarding speech or conduct that its members would engage in that might violate [the law]."); *Green v. United States Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (holding that the government's concession at oral argument that "[the plaintiff]'s proposed course of conduct would not run afoul of the [law] . . . ends any 'credible threat of prosecution' against [the plaintiff], leaving him without standing").

Finally, the Quicks argue that even with the Court's ruling, ¶ 3(h) still chilled their speech, because the topics provided to the Court "were not exhaustive of all the things the Quicks wanted to say or discuss at the" Special Meeting—so their chilled speech should not be confined to those topics.  (ECF No. 117-1 at 26-27.)  But that expansive approach to chilled speech conflicts with the principles that govern the injury-in-fact requirement.  To establish an injury in fact, the Quicks must show "an intention to engage in a course of conduct arguably affected with a constitutional

interest," that their intended conduct was "arguably . . . proscribed by" ¶ 3(h), and that they faced "a credible threat of prosecution." *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). Without that showing, the Court cannot analyze "what [the Quicks] [wanted] to do," "whether what they [wanted] to do even arguably [fell] within the scope of [¶ 3(h)]," "whether they face[d] a credible threat of [enforcement] by the [Township]," or "whether what [the Quicks] want[ed] to do is protected by the First Amendment in the first place." *Carrico*, 656 F.3d at 1007. After all, to be credible, the threat of enforcement "may not be merely 'imaginary or wholly speculative.'" *New Jersey Bankers Ass'n v. Att'y Gen. New Jersey*, 49 F.4th 849, 855 (3d Cir. 2022) (quoting *Driehaus*, 573 U.S. at 160).

Minding these principles, when determining whether the Quicks' self-censorship gives them standing, the Court analyzes only the planned speech in the record. It does not speculate whether all commentary that theoretically could have been said was objectively reasonably chilled.[15] The undisputed record makes clear that the Quicks had no reason to believe that ISBR or the Township would enforce ¶ 3(h) of the Settlement Agreement against them for their planned commentary. "Without a credible threat of enforcement," the Quicks "can establish neither a realistic threat of legal sanction if [they] engage[d] in the speech in question, nor an objectively good reason for refraining from speaking and 'self-censoring' instead." *Greenberg*, 81 F.4th at 388 (quoting *Abbott*, 900 F.3d at 176). And so, because the Quicks' second theory of harm fails, they lack the injury-in-fact necessary for Article III standing.

---

[15] It is noteworthy that during Christoper Quick's deposition, when counsel for the Township asked what Christopher Quick wanted to say, counsel for the Quicks objected: "Calls for speculation." (Harrison Aff. Ex. L, C. Quick Dep. 11:17-20; *see also* Harrison Aff. Ex. K, L. Quick Dep. 38:21-39:19 (same question and objection).)

## IV.    CONCLUSION

For the reasons set forth above, the Township's motion for summary judgment is **GRANTED**, the Quicks' cross-motion for summary judgment is **DENIED**, and the amended complaint is **DISMISSED** for lack of subject-matter jurisdiction.[16]   An appropriate Order follows.


Dated: August 30, 2024

*Georgette Castner*
GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[16]    "[A] dismissal for lack of subject matter jurisdiction is not an adjudication on the merits and thus should be ordered 'without prejudice.'" *Associated Builders & Contractors W. Pennsylvania v. Cmty. Coll. of Allegheny Cnty.*, 81 F.4th 279, 291 (3d Cir. 2023) (quoting *Figueroa v. Buccaneer Hotel Inc.*, 188 F.3d 172, 182 (3d Cir. 1999)); *see Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 209 (3d Cir. 2021) ("Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper." (quoting *Cottrell v. Alcon Lab'ys*, 874 F.3d 154, 164 n.7 (3d Cir. 2017) (alteration in *Ellison* omitted))).